Thank you, Your Honor, and may it please the Court, Graham White for the United States. The District Court's finding that the government bears 100% of the responsibility for the plaintiff's injuries in this case under Texas's Proportionate Responsibility Statute. Can you move your microphone up a bit? Yeah, so that you can be heard better. Okay, sure. I'll start over. The District Court's finding that the government bears 100% of the responsibility for the plaintiff's injuries is deeply implausible and clearly erroneous. The District Court paved the way to this outcome by making factual findings that are both physically impossible and contrary to the views of both parties experts, and it compounded these errors by awarding a sum of damages that is grossly disproportionate to awards in similar cases and consists of an award of future damages that is now inequitable in light of Mr. Lee's recent passing. Now, unless the Court would like me to begin anywhere else, I'll start with our arguments on apportionment of fault. At the threshold, the District Court should have assigned at least some responsibility to Mr. Lee for crashing his vehicle after the initial fender bender with the Postal Service truck. The District Court declined to do so based on the theory that the plaintiff suffered from a complete chalkstick fracture of his spine after this initial fender bender. The problem with this theory is that it's physically impossible because as both parties experts explained, this type of fracture is highly unstable. As its name suggests, a chalkstick fracture is when the spine severs like a piece of chalk. It's a complete through-and-through fracture of the spine. And when this happens, any subsequent movement has the potential to cause the spine to become, has the potential to cause the fracture to become displaced. And so as both experts explained below, this often happens where the patient with this type of fracture is moved from one bed to another in an operating room. And so, to say nothing of a high-speed automobile crash. And so if the District Court were correct that Mr. Lee had suffered from this type of fracture after the initial fender bender, the second high-speed collision into his neighbor's house would have rendered him an immediate quadriplegic. It would have been a complete and devastating paralytic injury. And importantly, there's no dispute among the experts about this, okay? To this date, we know that instead of becoming an immediate quadriplegic, he got out of the vehicle on his own. He walked around the accident scene. And to this date, we have not heard any explanation, not from the District Court, not from the plaintiff's experts, and not from the plaintiffs on this appeal, as to how that is possible. And despite the facial implausibility of the District Court's theory, even setting that aside, the District Court's version of events is contrary to Mr. Lee's own statements after the accident. So there are three sets of contemporaneous statements here that Mr. Lee made to first responders. There was his conversation with responding police officers that was body camera footage. There was a conversation with responding EMTs while he was being transported in the hospital to the emergency room. And then there was another medical record documenting his stay in the ER itself. In all three of those conversations, Mr. Lee did not indicate that the crash happened because he lost control of his legs or was experiencing symptoms of paralysis after the initial impact. And that is a highly pertinent fact to tell medical providers after the accident. That's not what he said. What he said is that he caused the crash because he accidentally hit the gas instead of the brakes, and that he panicked. So what is... Do you believe that the District Court is just incorrect whenever the District Court's opinion says that as plaintiff's spinal expert opined that the fracture and corresponding neurological injury occurred at the first impact explains Mr. Lee's stated inability to withdraw his right leg. So you said from the accelerator after being re-ended, rear-ended. Are you saying that the plaintiff's spinal expert did not opine that? Because you said both experts agree that this couldn't have happened this way and the District Court made it up basically is what you are arguing. Right, so both experts stated that again when you have this type of fracture, any subsequent movement will lead to a paralytic injury. Both sides of that, both experts agreed with that. Now the government's expert here, Dr. Coleman, stated that the logical conclusion from that is that had the plaintiff had this type of fracture and had got into a high-speed automobile accident that he would have been immediately paralyzed. The plaintiff's expert did not dispute that. He was asked on cross-examination whether he disputed that aspect of the government's expert's opinion and he stated that he did not. All right, so for the District Court to say that it was unrebutted, or excuse me, that the argument of the government's expert witness was contested, that is false. It was not contested. There is no dispute here about the nature of these injuries and that it was physically impossible for the plaintiff to suffer a chalk stick fracture and then get into this type of collision and walk out. So what does that tell us? It tells us that Mr. Lee did have control of his extremities after the initial fender-bender as he told first responders and what that means is that he bears at least some responsibility for his injuries under Texas's proportionate responsibility statute. Now even apart from this critical error in the District Court's findings, Mr. Lee bears additional responsibility for failing to wear a seatbelt. On this issue, the District Court expressly noted in footnote 3 of its opinion that it was not making a factual finding here on this issue, so there's nothing to defer to. In footnote 3, the District Court summarizes the evidence on both sides but expressly states that a factual finding on here on this was not necessary and here the evidence is clear that he was not wearing a seatbelt. Again, he told responding EMTs that he wasn't wearing one. The medical records demonstrate that, according to the medical records, note that there were no seatbelt bruises or seatbelt marks on his torso, which would have been expected from this type of collision. And then we have photographic evidence of the vehicle showing that the seatbelt pretensioner, showing showing that the seatbelt could not have been worn because of the seatbelt pretensioner in this situation. And so Texas courts routinely assign at least some fault, in many cases 50 to 100 percent fault, to plaintiffs who don't wear a seatbelt in these kinds of accidents and the District Court assigned no responsibility, no fault to Mr. Lee and that was clearly . . . Let me ask you on the facts. There seem to be two things at least. There was evidence of potential malfunction in this old of a vehicle and maybe this model of a vehicle, where the seatbelt doesn't act in the way that it was supposed to, that I forget exactly how it works, if there's collision or not. Whatever it is, if it's supposed to be the red flag that showed the seatbelt wasn't on, that it could have been a malfunction and the seatbelt had been on. Clarify what it is I think I'm talking about. But it does seem to me, secondly, this was such a slow speed incident and the absence of markings on his body and whatever else, it seems to me, could be discounted because it wasn't a particularly . . . I mean that's part of the problem, part of the tragedy of this case is such a slow speed accident and except for his condition, he would have had these injuries. So it does seem to me there are factual arguments, facts and evidence going the other way. So on the seatbelt issue, again there was no finding by the District Court here so even if there . . . No findings, that's a different question. But insofar, if you're saying that the evidence clearly supports that he was not wearing a seatbelt, I'm not sure that's true. So I disagree, Justice Affleck, because first with respect to whether this was a high-speed collision or a low-speed collision, as Your Honor said, the initial fender-bender happened at about two to three miles per hour. That was a low-speed collision. The second collision in which the plaintiff crashed into his neighbor's house, the car was traveling at about 20 miles per hour and the front of the plaintiff's car was a wreck afterwards. And so under those circumstances, medical providers would expect there to be at least some sort of markings on the plaintiff's torso. What the evidence was that perhaps he was going 15 to 20 miles an hour when he hit the house. Yeah, about 20 miles per hour. And the photographs of the car accident are in the record. They show that the front of the plaintiff's car was totaled in this situation. And so as a result, I think again Texas courts routinely assign responsibility to the plaintiff, at least some responsibility. And for the District Court to assign none to Mr. Lee under the circumstances was clearly erroneous. Responsibility for the accident because he's not wearing a seat belt? Or you're saying that the damage is resulting? This idea that automatically the seat belt gets you a certain percentage, that's just not true in Texas courts. So plaintiffs have a, drivers have a responsibility, have a legal duty to wear a seat belt when they're operating their motor vehicle. And when they don't wear the seat belt, that is a breach of that duty. It's negligence. And so under Texas's proportionate responsibility statute, the District Court is required to assign a percentage of responsibility based on each actor's negligence. And here . . . Not if it doesn't contribute to the injury. And I thought that that's what the District Court determined, is that whether or not he was using the seat belt, would it have prevented the quadriplegia? And that that's not, there's no indication that it would have had a result in this case. And so the District Court didn't need to determine this. And there is conflicting evidence, there's testimony, and there's also a first responder report. So there, it's not accurate to say that there's not conflicting testimony on the seat belt. There's conflicting evidence for sure. Yes. And then, but the court, I thought, determined that it didn't matter for the injury. And so you don't automatically get part of the proportionate responsibility in a car wreck case because you're not wearing a seat belt. It's, it might be determinative for your injuries if that's the kind of injury that you have. But that's just not true. What, I So a couple of responses. Yes, there is conflicting evidence on the seat belt. I did not say otherwise. But I think what I meant to say is that because the District Court did not make a factual finding on that, this is not a situation where clear error applies and the court has to pick one view of the, one permissible view over another. My point is that the evidence overall suggests he was not wearing a seat belt for the reasons we discussed in our brief. Now, as for the District Court's explanation, the court declined to make a finding based on its view that the fracture happened at the, at the initial fender bender, which, again, is physically impossible. And so as long as the court were to find that the fracture happened in the second impact, when the plaintiff crashed his vehicle into, into his neighbor's house, then it becomes highly relevant whether the plaintiff was wearing a seat belt because all the experts in this case agreed that the seat belt would have reduced the force, the resulting force on the, the driver's spinal fracture. So it is relevant for the second crash. One of your arguments that it had to be in the second, that he was able to get out and move, well, if it happened at the second collision, he would not have been able to get out and move. It seems to me that this, this factual scenario looks like whatever got set in motion, whether it was sufficient after the first collision or took the second, did not immediately manifest in quadriplegia, no matter which collision it was. So it did because what happened is after he got out and walked around the accident scene, that's when the spinal fracture began to displace and he immediately began to... Well, but why couldn't it have been, he was still sitting, not getting out of the car after the first collision, and so whether the fracture had already occurred or happened at the second time, it still took his getting out and moving around for it to manifest itself into quadriplegia. Right, so the, the plaintiff began experiencing the symptoms of quadriplegia in the driveway, which is consistent with the view that he suffered the jockstick fracture after the second impact, because once he got out, then he starts to move around the accident scene and those slight movements lead to the displacement and he starts experiencing this neurologic dysfunction in the driveway. Can you talk about whether or not the fact that unfortunately that he's not going to be here to receive future care, does that have any impact on this? Yes, so this court has the discretion to either modify the damage award accordingly or to remand to the district court. What case says that? Sure, so... Did you cite that to us in any form? Well, we didn't cite this because Mr. Lee unfortunately passed after a briefing. Right, but you didn't file a 28J and you're about to cite a case to us, is that correct? So I'm happy to just... No, it's okay. Are you about to cite a case to us? Yes. Well, then Mr. Levenger will have seven days to respond to the citation of the case. Did you tell him about it before you got here? So, if the court would prefer, we could just file a 28J. Okay. Well, no, I'm, you're here and I'd like to hear if you have some reason. One suggestion I have, Chief, we might want both sides to submit letter briefs. Sure, you can both submit 28Js. Not a 28, or 28J, if that's what our Chief says, but each of you would deal in simultaneous filing on where we are after the death. So, I'm happy to go about this. Cite a case, we want the case. Okay, sure, sorry. So, it concerns citizens of Vicksburg v. Sills, this is 567 F. 2nd 646 and footnote 5, speaks to this court's inherent authority in exercising appellate jurisdiction to not only correct errors in the judgment, but also to dispose of a case as justice requires, and its obligation to take into account changes of law, in fact, that happened during the pendency of an appeal that operate to deny litigants substantial justice. How has the government been denied substantial justice? You know, the fact that the person passed. Right. That's, they could have lived longer than, you know, you could have been, they could have been, we don't, that's just the way it is, that they don't need all that care anymore. Because under the district court's own reasoning, and I see my time is about to expire, if I could just. Please do. Yes, so under, we're challenging, among other things, the district court's award of 18 million in non-economic damages, which includes 13 million in non-economic damages to compensate the liaise for future injuries, the district court's opinion expressly states that this 13 million dollar figure was calculated based on a life expectancy of 13 years, or about 12.6 years. So about the time at the trial, it was a reason, it was a reasonable calculation, and it's, perhaps. Right, but my point is that it is well within this court's authority, because we were still on a direct appeal of the final judgment. This is not a situation where litigants are running back to the courthouse years after a final judgment has been entered, and the appeal has been resolved. This court has the authority on a direct appeal to take into account the changes in facts, and whether it wants to remand for the district court in the first instance, or to, in light of Mr. Lee's death, there shouldn't be any dispute that the 13 million dollar future damages figure is now inequitable under the district court's own reasoning. So it isn't. Well, I think that there might be doubt on that. You said there should not be any doubt of that, so. And that might be a reason for this court to remand to the district court, because in the case that we, that I just cited on this. Or the court could do nothing in its discretion, correct? It's totally discretionary? Well, look, I think, I think if this court were to remand for any reason, I think the court would have to reassess damages, I don't know. I think it would be potentially an abuse of discretion to award 13 million dollars in damages for the future, again, when the district court stated reason for that amount was the 13 year expected lifespan, and unfortunately that is not what happened in this case. I think the Texas legislature long ago dealt with this problem of a person that dies after the event, that you don't get the benefit of having, colloquially, taken away his long life. In other words, that he's gone, and it's not now incurring, the family incurring all the expenses, et cetera, that doesn't matter. That that sum still belongs to the estate. Now there's a Texas statute that deals with, specifically with that. So I think, again, my response, and I'm sorry to go over my time here, is just that, because, again, we are still dealing with a direct appeal of the final judgment, and this is not a Rule 60B situation where we're coming back and asking, seeking a modification after the fact, this court does have the inherent authority to modify a judgment accordingly. But with that being said, we strenuously maintain that the award of damages in and of itself is violative of the maximum recovery rule, and we'll rest on our briefs on that point. We've proposed a number of more suitable comparator cases for this court to go category by category on that. Thank you. We have your argument, and you still have time for rebuttal. Chief Judge Elrod, may it please the Court. We reported Mr. Lee's death to the government on October 31st, and we've heard nothing from the government about the effect that that death might have on the damages, including the future damages, and the reality is it has no effect as a matter of law. I have a case from the Southern District of Mississippi called West v. United States. It happened to be a Federal Tort Claims Act case where the gentleman died between the time the case was submitted to the trial judge and the time he rendered his opinion. So it wasn't even after the judgment, it was in the meantime, and the court said, I'm going to render judgment non-protonque. I'm going to hold that the death has no effect whatsoever upon my previous fact findings. The court said, Mr. West's subsequent death will not impact this court's factual findings based on the evidence presented, even with respect to an award for future damages. And that is, and it should be the law, because the government presented evidence of his expected lifespan. We presented evidence of expected lifespan. The court actually went with their estimate of expected lifespan, and that's what they're now bound by. If Mr. Lee had outlived the court's expected lifespan, we wouldn't have any right to come back in the court and say he gets more future damages. So the bottom line is his death has no effect on any award, including the award of future damages. And the probate proceedings are proceeding, and we have the right person designated temporarily until such time as... That probate proceeding is going on, and I suspect his son will be appointed as executor. And Judge Higginbottom, you're right. The Texas legislature, in the medical malpractice scenario, does say, does provide for future periodic payments in the med mal context. And if the person dies, those payments cut off. But there's nothing similar to that in the Federal Tort Claims Act or outside the medical malpractice context. Now, the court has not heard any argument from the government about any legal errors made by Judge O'Connor. The argument are basically that he's made factual errors, and they've not met their burden of showing that this very experienced trial judge, Judge Reed O'Connor, erred in any of his fact findings, let alone all of them across the board, which is essentially what they're saying. Judge O'Connor did not err, let alone clearly err in any way. Did he come up with this idea that it was the first impact in a way that would be contrary to all the experts in the case? Well, that's absolutely wrong. I mean, that was the argument of your friend on the other side. Dr. DeLonga, our lead expert, who's not only a radiologist but also a physician and a biomechanical engineer, testified unequivocally that the spine was fractured in the first impact. And he relied upon three pieces of evidence, really. One was the condolizing spondylitis that made Mr. Lee particularly susceptible to spinal fractures at low impacts, like the impact with the postal  As a radiologist, he relied upon the fracture pattern. And the fracture pattern showed that it was very consistent with Mr. Lee's movement in the vehicle following the first impact with the postal truck. He was moving back and to the right. The fracture pattern was on the left side. There was a displacement or an asymmetric fracture on the left side. And Dr. DeLonga unequivocally said that's consistent with the first impact. And then finally, you have not only Mr. Lee's testimony, which the court credited, but also Dr. DeLonga's explanation and Dr. McPherson's explanation, the other expert who testified that the spine fracture in the first impact, about the effect of that spinal fracture, which was the transient neurological dysfunction, which rendered his foot, rendered his leg unable to remove it from the accelerator and put it on the brake. What about the argument made by your friend on the other side that he couldn't have done what he did at the scene had it been in the first impact? Well, that testimony came exclusively from their spinal expert, Dr. Coleman. And it was utterly conclusory, speculative, and unsupported. Remember, Dr. Coleman is a spinal expert. He's not an accident reconstructionist. He's not a biomechanical engineer. So when he said that, he wasn't taking into account anything in relation to the second impact. He wasn't taking into account the direction of force, the change in velocity, the movement of Mr. Lee in the vehicle, or most importantly, the effect of these, of the vehicle's restraint devices, the airbag and the seatbelt, in protecting him in that second impact. Well, your counsel, post-counsel said that it was unrebutted testimony. Is that accurate? No, it was rebutted. It was rebutted by Dr. McPherson in response to a question from the government's lawyer where he said, no, I don't think it's necessarily the case that a catastrophic event will occur after a spine fracture. So he did disagree with that. And Judge O'Connor looked at these x-rays and things himself from the radiologist at the trial? He did. In fact, you have the, one of the radiology images in your record excerpts, Exhibit 42, and it shows that, that displacement on the left side that's consistent with the movement in the first impact where he's moving back into the right. What about the seatbelt? Well, the seatbelt, the court made a couple of findings, really. First of all, he found that the evidence of seatbelt non-use was inconclusive, meaning that the government just didn't meet its burden of showing contributory negligence from not wearing a seatbelt. And that, and the evidence was, there was ample evidence that he was wearing a seatbelt. First of all, he testified to that effect. He said, I was wearing my seatbelt as I always habitually do. And then he said, after the second impact, I unbuckled my seatbelt and got out of the vehicle. His family members testify that he's an habitual seatbelt wearer. And finally, there were, there are at least four records from first responders in the record where they report that he was restrained. And you'll see a discussion of those at page 6332 where their expert, Mr. Storvik, was being cross-examined and he had to admit that there were these four first responder indications that he was in fact restrained. The evidence of non-use is based on this pretensioner theory. The idea being that the pretensioner fired and locked the belt into place in the B-pillar. Well, I think it's more plausible that, that the belt retracted into the B-pillar because he unbuckled it. That's what seatbelts do. They retract into the B-pillar when you unbuckle it. That's more plausible. The, there was no evidence that the pretensioner was actually working in this 14-year-old vehicle. Nobody tested it. They talk about some loose piece of trim, but our expert, Dr. Leifer, said that's just consistent with wear and tear on a 14-year-old vehicle. So all of that was explained. The court also said that, that they did not prove causation with respect to the seatbelts. The court said that there's just no evidence that wearing a seatbelt, assuming he wasn't wearing it, would have prevented the injury that ultimately occurred. The court said it's irrelevant. Actually, the expert said it's irrelevant in the first impact because he's, again, he's moving back and the seatbelts don't play any role when you're moving back. As for the second impact, there's just no evidence that wearing the seatbelt, again, even assuming he wasn't, would have prevented the injury that ultimately occurred, the quadriplegia. There was some testimony that, you know, wearing a seatbelt in the second impact might have lessened the, the impact on his spine or words to that effect, but nobody said that wearing the seatbelt would have prevented the quadriplegia that occurred the next day while he was being operated on. The comment was made that, that the first impact theory is implausible, I think was, were the words. In reality, their second impact theory is implausible. It, it would require one to believe, and Judge O'Connor refused to believe this, that, that Mr. Lee kept his foot on the accelerator for six full seconds, 1,001, 1,002, 1,003, over 90 feet without putting it on the brake, even though he clearly reacted to the situation and, as the government admitted, he was actively steering, steering away. That just doesn't make sense at all. I mean, as the court said on page eight, if he was actively steering, one would think that he'd also take his foot off the accelerator and put it on the brake, if he could, but the problem was he couldn't, and it was because of the transient neurological dysfunction caused by the spinal fracture in the first impact that, that prevented him from putting his foot on the accelerator. Was he clear about that at the time of the accident? No, absolutely not. He was saying contradictory things because, as he later said, I didn't understand what was going on, but he did at the time of trial, and the court quoted his testimony in full in the opinion. There wasn't any discussion in the opening about the esophageal tear. I'll briefly mention that. They tried to fault Dr. Birchuk, the spinal surgeon, but it really comes down to Dr. Coleman's, literally, two scant pages of testimony at pages 61, 43 to 44, which the trial court correctly found were simply conclusory, speculative and unsubstantiated. His testimony was really off the cuff. He was really talking about Dr. Birchuk's work with respect to the quadriplegia, the surgery, but he sort of pivoted and talked about the esophageal tear in an effort to try to blame it on Dr. Birchuk. The problem is, in a Texas medical malpractice case involving allegations of delayed recognition and treatment, you need to be very specific about the timeline. Every Texas Supreme Court case makes that abundantly clear, and Dr. Birchuk was not specific at all. In fact, he admitted he hadn't read the medical records with any degree of specificity, so as a result, he couldn't answer any of the questions you need to answer in these types of cases. For example, when did the tear develop? He didn't say. When was it detected? Again, he didn't say. When should it have been detected? Didn't say. When was it treated? When should it have been treated? Do you have anything to say about the maximum recovery rule that was talked about at the very tail end of the . . . Sure. I'll talk about it generally, and then I guess if anybody has any questions about specific components, I can address that, but to begin with, the government really conflates two steps in the analysis. The maximum recovery rule really doesn't come into play and shouldn't come into play until the court first determines, based upon state law standards of review, that the award is indeed excessive in the first instance, and then, if that's determined, then you turn to the maximum recovery rule to determine the amount that's appropriate. The government skips over the first step and go directly to the second, although, I give them credit, they do admit in their trial briefing below that a trial court has, quote, a great deal of discretion, close quote, in awarding non-economic damage, as they said that at page 2673. I couldn't agree with that more, and I think Judge O'Connor was extremely careful and indeed somewhat conservative in awarding non-economic damages to this . . . in this terribly catastrophic situation where not only do you have quadriplegia, but he suffered a double amputation, the esophageal tear, enormous depression, and suicidality, which makes this case truly unique amongst Texas cases. But even assuming the maximum recovery rule does apply at both steps, the court, I think, was correct in saying that it's inoperative, because all of his awards, with one minor exception, which I'll talk about, were within 133% of the highest inflation adjusted award recovery in Texas cases. The one exception was a very small one, and that was with respect to future pain and mental anguish. The court awarded a total amount of $4.4 million. He looked to a case, a 1988 case called Howard, which involved a gentleman who was paralyzed in all four extremities like Mr. Lee, and the court awarded an inflation adjusted, multiplier adjusted total of about $3.7 million. So there's a bit of a spread. I think it was $650,000. The court said, I find this case to be unique in this regard, and an upward adjustment is permitted under Fifth Circuit authority. The Lermont case, the Douglas case, the LeBron case, all recognized that upward departures are appropriate. And he said it's appropriate because, unlike Mr. Howard, Mr. Lee has the things I mentioned, double amputation, depression, esophageal tear, visit, constant visits in and out of the hospital, and he recognized the agony. I recognize the agonizing pain that Mr. Lee has gone through that justified this slight, slight upward departure. I would also point out that he could have relied upon a couple of Texas appellate court decisions. So happened I handled both of them. One was a case called Emerson, and one was a case called Burry, both of which would have allowed awards for, would have supported awards for future pain and mental anguish, even well in excess of what the court awarded. Another big item, I think, of his non-economic damages was future impairment. That was a $5.2 million number. Notably, the government doesn't even talk about that in their reply brief. They talked about it in their opening brief, but not in their reply brief. The Burry case is factually comparable, where the court awarded an adjusted amount of about $5.7 million to a woman who was brain damaged, and it rendered her basically impaired for a lifetime. But I think her impairment, it's fair to say, was less than Mr. Lee's, because while her daily life was certainly impacted by her brain damage, she at least was ambulatory. Mr. Lee's life was confined to a bed 24-7. He couldn't move, couldn't care for himself, couldn't do anything. So I think, again, the court's award was fair and reasonable compensation and comparable to Burry's. Do you have anything else, Mr. Levenger? I don't, Your Honor. I was about to wrap up and ask if the court has any questions. I'll be happy to answer them, but if not, that'll conclude my argument. Thank you. Thank you. You just have time for rebuttal. Thank you, Your Honor. I'll just, just a quick, a few quick points here. I just want to be clear that no expert in this case disagreed with the opinion that the plaintiff would have been immediately paralyzed had he endured the force of the second impact with his spine already fractured. My friend on the other side is wrong in saying that that was rebutted, and I will just point, you don't have to take my word for it. If the court looks to page 6096 of the record, that is the relevant testimony where the government's, excuse me, where the plaintiff's expert is asked about this. He expressly concedes on cross examination that he did not dispute that aspect of the government's expert's testimony, and the testimony that my friend on the other side is referring to involved a hypothetical question about whether successive traumas to the spine of a football player would necessarily lead to a fracture in every case, and the answer was no, maybe not in every case. That has nothing to do with this particular set of circumstances. Okay, so this central problem in the district court's theory was not contested by the plaintiff's expert in any meaningful respect. Can't you read this that, like, that Dr. Coleman's testimony just wasn't considered credible by the district court in a number of respects, including this one? I mean, isn't that a fair reading of this record? So I don't think so, because ultimately we're not asking this court to choose between two competing credible views of the evidence. The district court's theory of events here is physically impossible, and that is enough unclear error for this court to reverse, and I would just say, taking a step back here, the district court's theory here is that a fender bender at about two to three miles per hour caused the plaintiff to suffer a complete shock stick fracture of his spine, which caused him to lose sensation of his legs, but apparently not his arms, as he drove and crashed his car, and then instead of becoming immediately paralyzed, he regains control of his legs and gets out of the car and walks around. That just doesn't make any sense, and I think it's quite telling that we still have not heard any explanation from my friend on the other side here as to how that is physically possible. I think there was some brief discussion about the x-rays, about the fracture pattern. All I'll say about that is that the CT scan showed that there was greater stress on the left side. That is consistent with both the initial fender bender and the second impact, because the plaintiff was driving his car to the left. Again, we're not asking the court to assess between two permissible views of the evidence. The district court's view is impermissible for the reasons that we stated here. So on the application of the maximum recovery rule, again, we'll rest on our briefs on that. The only point I think the district court's problem here is that it was relying on factual comparators that were just not factually similar. The most egregious example of this was the court's reliance on the Holcomb case, which involved a mass shooting, not an automobile accident, and involved levels of physical pain and anguish that I think are just not comparable to this particular case. And then the last point on the effect of the future damages, I don't want to go into any more case law. We'd be happy to submit a 28-J letter or anything else to provide authority rather than kind of do this ad hoc here. So unless the court has any further questions, we'd ask the court to reverse. Okay. I'm going to take Judge Southwick's very helpful counsel in this matter, and I'm going to ask that you would each . . . you would file within seven days of today's date, not technically a 28-J, but a letter brief not to exceed five pages with your position on this issue, and then the appellee will file within seven days thereafter not to exceed five pages on this issue. It would have been better to have . . . if this was actually going to be something you were going to argue to have teed it up ahead of time, but we're going to address it now because it is something that needs to be addressed. Thank you. Thank you, Your Honor.